IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                        CRIM NO. 09-00760 RB

FRANK L. GUTIERREZ,

      Defendant.

## MEMORANDUM OPINION AND ORDER

This matter came before the Court on Defendant's First Motion to Suppress (Doc. 15) and Defendant's Second Motion to Suppress and/or, in the Alternative, Request for *Franks* Hearing. (Doc. 19)  Having fully considered the parties' filings and the evidence and arguments presented at the motion hearing, the Court hereby **DENIES** both motions.

## I.    INTRODUCTION AND PROCEDURAL HISTORY

Defendant Frank L. Gutierrez was pulled over for a routine traffic stop during the early morning hours of November 12, 2008 while traveling eastbound on Interstate 10 near Lordsburg, New Mexico.  After conversing with Defendant, Sgt. Arthur De La Garza, who performed the stop, became suspicious that criminal activity was afoot.  Defendant's vehicle was then seized, a search warrant was obtained and police discovered 70.96 grams of methamphetamine in the trunk.  Defendant was indicted on March 26, 2009 for unlawfully, knowingly, and intentionally possessing 50 grams or more of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), and 18 U.S.C. § 2.  The case is set for trial the week of April 19, 2010.

1

Defendant filed two motions to suppress evidence collected during the search of his automobile.  In his First Motion to Suppress (Doc. 15), filed on January 6, 2010, Defendant requested that the Court suppress any evidence obtained from his vehicle contending the seizure of his vehicle and person was unconstitutional.  Specifically, Defendant argues that the seizure exceeded the scope and length of what was justified by the initial traffic stop and his continued detention was not supported by reasonable suspicion or voluntary consent.

Defendant filed his Second Motion to Suppress (Doc. 19) on January 11, 2010, requesting that the Court suppress any evidence obtained from his vehicle pursuant to the search because the warrant was invalid; or in the alternative, he requested the Court grant a *Franks* hearing to review the affidavit in support of the search warrant.  Specifically, Defendant argued that the affidavit contained material false representations and misleading omissions.

The United States filed a Response to Defendant's First Motion to Suppress (Doc. 23) on January 19, 2010, and Defendant filed a Reply (Doc. 34) on February 5, 2010.  The United States filed a Response to Defendant's Second Motion to Suppress (Doc. 24) on January 22, 2010, and Defendant filed a Reply (Doc. 35) on February 5, 2010.  The Court held a hearing on both motions beginning Tuesday, February 9, 2010 at 1:30 p.m.  At the end of the day, the Court adjourned until Friday February 12, 2010 to continue the hearing.  However, counsel for Defendant, Mr. Blackburn, took ill and was unable to appear before the Court on February 12, 16, 19, or 24 when the Court attempted to continue the hearing.  Defendant waived his right to a speedy trial and indicated that he wished to continue with his counsel of choice, even though this would delay his trial setting.  The Court found that forcing Defendant to continue without his counsel of choice or forcing Mr. Blackburn to continue with the motion hearing in his

2

compromised medical state would have been impossible or would result in a miscarriage of justice. (Docs. 50 & 57.) The suppression hearing was therefore continued until March 26, 2010 to permit Mr. Blackburn a full recovery.[1]

During the suppression hearing on March, 26, 2010, Sgt. De La Garza testified that he and his brother, Agt. Luke De La Garza, who prepared the search warrant, had made changes to the affidavit that accompanied the search warrant at the request of Judge Robinson after he had reviewed the officers' initial draft. These changes were minor, and after having made the changes, the last three pages of the affidavit were faxed back to Judge Robinson, who then signed the warrant. The suppression hearing was the first time Defendant heard this information, and he requested additional time to address these issues and submit a supplemental memorandum to the Court. At the conclusion of the hearing, the Court granted Defendant leave to file a supplemental memorandum and instructed the Government to conduct a search for the missing affidavit. By a letter dated March 29, 2010, the Government advised the Court that after a thorough search of its records, it was unable to find the initial draft of the affidavit. Defendant filed a supplemental memorandum (Doc. 64) on March 30, 2010. The Government filed a Response (Doc. 68) on April 2, 2010, and Defendant filed a Reply (Doc. 69) on April 6, 2010.

At the motion hearing, the Government presented a DVD of the traffic stop and subsequent investigatory detention that was recorded from the dashboard-mounted video camera in Sgt. De La Garza's patrol car. Sgt. De La Garza initiated the camera at 3:08 a.m., after he stopped Defendant, but before exiting his car and approaching Defendant's vehicle. The

---

1. By this time, the undersigned Judge, who was originally in Las Cruces on Inter-circuit assignment had returned to his home district in Southern Illinois. The parties agreed the completion of the suppression hearing could proceed by teleconference. The Court notes the technology worked well and the Court could see and hear the testimony and exhibits clearly.

accompanying audio begins a couple minutes later at 3:10 a.m.  The microphone for the audio was located on Sgt. De La Garza's lapel.  In general, the audio was of good quality, but some of the responses given by Defendant and his passenger, Brisa Martinez, were inaudible or difficult to understand due to the position of the microphone.

The Government also presented the testimony of Sgt. De La Garza.  The Court found Sgt. De La Garza to be an experienced officer—both on the street and in the courtroom—and his answers on direct and cross examination were deliberative, responsive and direct.  Sgt. De La Garza looked the court in the eye, engaged in no furtive conduct and did not display any nervous tics or behavior.  He answered the questions asked and rarely volunteered information, making it appear that his answers were neither rehearsed nor canned.  Additionally, he enjoyed good recall of the facts of the case without referring to notes or reports and his oral testimony was consistent with the facts shown on video.  Thus, the Court found his testimony credible and without dissemblance.

Defendant did not testify at the hearing, and the Defense did not call any witnesses.

## II.   STATEMENT OF FACTS

Just after 3:00 a.m. on the morning of November 12, 2008, Sgt. Arthur De La Garza of the Lordsburg, New Mexico Police Department observed a tan Honda Accord traveling eastbound on Interstate 10 between Lordsburg and Deming.  Sgt. De La Garza observed the vehicle cross the right shoulder line twice.  Sgt. De La Garza was conducting a DWI operation, and suspecting the driver might be intoxicated, he initiated a vehicle stop to further investigate.

Sgt. De La Garza approached the vehicle on the passenger side and asked Defendant for his driver's license, registration, and proof of insurance.  Defendant produced the requested

4

documents and handed them to Sgt. De La Garza, who observed that Defendant was abnormally nervous and that his hands were visible shaking.  Additionally, Defendant appeared somewhat agitated and complained about having been pulled over on several previous occasions in Lordsburg.  Sgt. De La Garza also noticed that Defendant's passenger, Brisa Martinez, appeared to be under the influence of narcotics, as her eyes were droopy and she was lethargic.  At the motion hearing, Sgt. De La Garza explained that in his years of experience he had observed numerous individuals under the influence of narcotics, and Ms. Martinez exhibited signs of someone who had been awake and high for some time, rather than, as Defendant argued, someone who was groggy because she had just been awakened.

Sgt. De La Garza asked Defendant to grab his jacket and accompany him back to his police cruiser so that he could issue a citation.  While standing in front of the police cruiser, Sgt. De La Garza questioned Defendant about his travel plans.  Defendant indicated that he was returning from a trip to Tucson, Arizona where he had gone to talk to a friend.  When asked his friend's name, Defendant hesitated for a moment, and then replied, "Ketcho."  Defendant explained that Ketcho was a cowboy who was in Tucson for a rodeo and that he had only been in Tucson a "couple hours" and had made a "quick turnaround trip," indicating that he had been through Lordsburg just three to four hours earlier.  This statement aroused Sgt. De La Garza's suspicions because Lordsburg is located approximately two hours from Tucson, and if Defendant had passed through Lordsburg just three to four hours earlier, that would mean that he would have arrived in Tucson and then immediately turned around.

Sgt. De La Garza told Defendant that he did not understand why someone would waste so much gas and drive to Tucson instead of telephoning his friend.  Defendant replied that he grew

up with his friend in Deming and had not seen him in many years.  At the suppression hearing, Sgt. De La Garza stated that while it is common for people living in the Lordsburg area to take long trips for shopping or other purposes due to the lack of stores in the area, it is not common for local residents to take such trips in the middle of the night.  Sgt. De La Garza testified that, in his experience, the majority of the traffic that is stopped on Interstate 10 during the night is people traveling to or from California, and that when officers encounter local traffic, they are often involved in some sort of criminal activity.

At 3:12 a.m., Sgt. De La Garza instructed Defendant to wait for him in front of the patrol car while he checked the Vehicle Identification Number (VIN) on the Honda to verify that it was the same vehicle listed on the registration.  When Sgt. De La Garza approached the vehicle, he engaged Defendant's passenger, Ms. Martinez, and inquired about their travel plans.  Ms. Martinez' responses were difficult to hear on the audio recording because she was inside and on the other side of the vehicle from Sgt De La Garza.  At the suppression hearing, however, Sgt. De La Garza testified that her responses were inconsistent and that she was being evasive and repeating the questions back to him.  Ms. Martinez first stated that she was "not sure" how long they had been in Tucson, then she stated they had been there "one hour," and finally she told Sgt. De La Garza that they had been there "all day."  When Sgt. De La Garza first asked Ms. Martinez what time they left Tucson, she stated that they had left at about 1:30 or 2:30 a.m., but when he asked again later, she said that she did not know.  In Sgt. De La Garza's opinion, Ms. Martinez was trying to hide something, further indicating that criminal activity may be afoot.

After having obtained the vehicle's VIN, Sgt. De La Garza returned to his patrol unit, radioed Defendant's information back to dispatch, and inquired about the availability of a Border

6

Patrol canine unit.  Sgt. De La Garza was becoming increasingly suspicious of criminal activity, and he wanted to get a canine unit en route to the scene.  Due to the remoteness of the location, it could take up to two hours for a canine unit to arrive, and Sgt. De La Garza did not want to have to continue the detention any longer than necessary.

At 3:14 a.m., dispatch radioed back that Defendant s license was valid.  Defendant asserts that Sgt. De La Garza was attempting to unduly delay his investigation at this point—presumably until he heard back from dispatch about a canine unit—by asking Defendant to confirm his vehicle color and inquiring whether he traveled through Lordsburg often.  At 3:19 a.m., Sgt. De La Garza asked Defendant why he was riding the right shoulder line and inquired if he was under the influence of narcotics.  Defendant denied being under the influence of narcotics, and Sgt. De La Garza returned Defendant's documents and informed him that he was issuing him a written warning.  At 3:21 a.m., Sgt. De La Garza gave Defendant a warning citation, had him sign it, and stated, "With that, you are good to go."

At the suppression hearing, Sgt. De La Garza explained that when he returned Defendant's license and issued the citation he was "cutting" Defendant loose and proceeding to a consensual encounter.  As Defendant was turning to leave, Sgt. De La Garza said, "If you don't mind, I have a couple questions I have to ask you."  He then told Defendant that based on everything that he had observed—his extreme nervousness, his illogical travel plans, his pause in recalling his friend's name, the inconsistencies between Defendant's account of the trip and Ms. Martinez's account and the fact that Lordsburg is a drug pipeline—he was suspicious that some kind of criminal activity was afoot.  Sgt. De La Garza then asked Defendant if he could search his vehicle for contraband, and Defendant replied, "You can search it; you can bring the dog if

7

you want to."   At the suppression hearing, Sgt. De La Garza testified that he understood Defendant to have consented to a search of his entire vehicle.

At 3:25 a.m., however, when Sgt. De La Garza informed Defendant that Ms. Martinez could sit in his patrol unit during the search, Defendant recanted, stating that he had not given consent for Sgt. De La Garza to search the vehicle.   Sgt. De La Garza then asked, "Oh, you didn't say I could search it?"   Defendant responded, "No, I said bring the dog."   Sgt. De La Garza inquired, "Oh, the way I understood it was you said, 'search it.'   So, I can't search it?" Defendant replied, "No, bring the dog and run it around the car if you want to. That's all right; it's cool."   At the suppression hearing, Sgt. De La Garza testified that he believed Defendant had overheard the dispatch call indicating that a dog was not available and then decided to agree with the one search option that was not available.

After Defendant revoked his prior consent to search, Sgt. De La Garza approached the vehicle to make contact with Ms. Martinez a second time.   Ms. Martinez was still lethargic and mumbling, and this further confirmed Sgt. De La Garza's suspicion that she was under the influence of narcotics and not just groggy from having been awakened.   Sgt. De La Garza requested Ms. Martinez's identification and asked if she was under the influence of methamphetamine; Ms. Martinez indicated that she was not.   Sgt. De La Garza then asked her if she would mind if he searched her purse.   Ms. Martinez consented, and she went through the contents of her purse as Sgt. De La Garza looked on.

Due to Ms. Martinez's appearance and the way she was responding to questions, Sgt. De La Garza decided to ask her some questions to test her awareness and confirm his suspicion that she was under the influence of methamphetamine.   Sgt. De La Garza again asked Ms. Martinez

8

what time Defendant had picked her up and what time they had left Deming.  She stated that she

was not sure what time Defendant had picked her up, what time they left Deming or what time

they left Tucson.  Sgt. De La Garza noted that this was inconsistent with what she had said

earlier when she indicated that they had left Tucson at around 1:30 or 2:30 a.m.  Sgt. De La

Garza testified that he suspected she had forgotten what time she had told him earlier, or that she

did not want to tell Sgt. De La Garza something different from Defendant.  Sgt. De La Garza

found Ms. Martinez's evasiveness suspicious and consistent with the other indications of

criminal activity he had noted.  Sgt. De La Garza then asked Ms. Martinez if they had gone to

pick up drugs in Tucson, and she indicated that they had not.  When Sgt. De La Garza contacted

dispatch with Ms. Martinez's driver's license number, dispatch responded that Ms. Martinez had

an active arrest warrant for her in Grant County; however, dispatch did not know if the warrant

was extraditable, and, therefore, Sgt. De La Garza did not know if he could arrest her.

Sgt. De La Garza then decided to contact his brother Agent Luke De La Garza of the

Border Operations Task Force to see if he had any information about Ms. Martinez or Defendant.

Agent Luke De La Garza worked in the Deming area as a narcotics officer, and as a result, his

brother believed he might have some information.  After talking to his brother, Agent Luke De

La Garza contacted a "Mr. Pedrales," an undercover narcotics agent in Deming.  Pedrales had

worked in Deming for more than ten years and knew most of the individuals in that area

involved in drug trafficking.  At 3:42 a.m., Agent Luke De La Garza called his brother back and

indicated that Pedrales had information about Defendant moving drugs in the Deming area;

therefore, he should seize the vehicle, and he would come out to type out a search warrant.  Sgt.

De La Garza then informed Defendant that he was free to go, but that they were going to seize his vehicle.

At 4:18 a.m., a tow truck arrived at the scene, and the dashboard-mounted camera in Sgt. De La Garza's police cruiser was turned off.[2]  Defendant and Ms. Martinez were given a ride to a nearby truck stop in Lordsburg, approximately 60 miles from Defendant's home in Deming.  Sgt. De La Garza accompanied the vehicle back to the police department where he secured it with evidence tape to protect the integrity of the vehicle and its contents.  He and Agent De La Garza then began working on the search warrant.

Sgt. De La Garza dictated the details of what had happened to Agt. De La Garza who typed out the warrant.  When the officers completed the warrant at around 7:30 a.m., they faxed it to Judge Robinson, state district court judge for the Sixth Judicial District of New Mexico. Judge Robinson did not immediately sign the warrant, but called Agt. De La Garza to discuss some concerns he had about pages nine and ten of the warrant, the "Body of the Affidavit," which was dictated by Sgt. De La Garza and which described the traffic stop and investigative detention.

At some point during the conversation, Agt. De La Garza handed the phone to Sgt. De La Garza.  Judge Robinson asked Sgt. De La Garza to explain the term "pipeline."  Sgt. De La Garza then explained how drugs were commonly transported along Interstate 10 from source cities such as Deming, Tucson, and Phoenix, to cities in the Eastern United States.  According to Sgt. De La Garza, Judge Robinson then requested that the officers change the second to last sentence in paragraph four of the "Body of the Affidavit" from "Sgt. De La Garza requested

---

2.  The Court notes that Sgt. De La Garza's testimony in areas important to the consideration of the motions at hand was entirely consistent with the Court's review of the DVD.

consent to search the vehicle," to "Sgt. De La Garza thought it was reasonable to request consent to search."   At 8:11 a.m., the officers faxed the revised "Body of the Affidavit" back to Judge Robinson along with the front page of the affidavit, and the pages were inserted into the original warrant request.   Judge Robinson then signed the warrant and faxed it back to the officers at 8:30 a.m.  The officers executed the warrant and found a coffee canister in the trunk containing a plastic baggy with a crystalline substance, which was later identified as 70.96 grams of methamphetamine.

## III.    LEGAL ANALYSIS

### A.    First Motion to Suppress

The Fourth Amendment to the U.S. Constitution prohibits unreasonable searches and seizures and extends to brief investigatory stops of vehicles that do not constitute an arrest, such as the traffic stop in the case at hand. *United States v. Arvizu*, 534 U.S. 266, 273 (2002).   "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has a reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995).   In the case at hand, Sgt. De La Garza observed Defendant cross the right shoulder line twice and pulled him over because he suspected he was intoxicated.   In his motion, Defendant does not contest the legality of the initial traffic stop, and from the facts available to the Court Sgt. De La Garza was justified in conducting the stop.   Additionally, there does not appear to be anything out of the ordinary with Sgt. De La Garza's questions about Defendant's trip to Tucson: the Tenth Circuit has consistently held that "during [a] stop, an officer may ask

routine questions about the driver's travel plans." *United States v. Bradford*, 423 F.3d 1149, 1156 (10th Cir. 2005); *see also United States v. Williams*, 271 F.3d 1262, 1267 (10th Cir. 2001).

At 3:14 a.m., dispatch advised Sgt. De La Garza that Defendant's license was valid. Nonetheless, Sgt. De La Garza continued to investigate, presumably to dispel his concerns that Gutierrez was intoxicated. *See United States v. Lyons*, 510 F.3d 1225, 1236 (10th Cir. 2007) ("A seizure that is justified solely by the interest in issuing a warning ticket to the driver may become unlawful if it is prolonged beyond the time reasonably required to complete that mission."). At 3:19 a.m., Sgt. De La Garza inquired whether Gutierrez was under the influence of narcotics, and Defendant responded that he was not. At 3:21 a.m., with the initial purpose of the traffic stop completed, Sgt. De La Garza returned Defendant's documents along with a written warning and said, "With that, you are good to go."

Up until 3:21 a.m., there were clearly no Fourth Amendment violations: Sgt. De La Garza acted diligently to verify that Defendant was authorized to operate the vehicle and dispel his concerns that Defendant was intoxicated. *See United States v. Sharpe*, 470 U.S. 675, 686 (1985) ("In assessing whether a detention is too long in duration to be justified as an investigative stop, we . . . examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly . . . ."). Indeed, Defendant even seems to agree with this analysis, stating that at 3:21 a.m. "the purpose for the initial stop ha[d] been satisfied within approximately twelve minutes." (Doc. 15, p. 4.) This was obviously a reasonable length of time in which to conduct a traffic stop and issue a warning citation.

Defendant does, however, contest his continued detention after 3:21 a.m. Brief investigatory detentions of vehicles and persons, as in the case at hand, are governed by *Terry v.*

12

*Ohio*, which requires that the detention be "reasonably related in scope to the circumstances which justified the initial stop." *United States v. Williams*, 403 F.3d 1203, 1206 (10th Cir. 2005). Further detention and questioning is permissible only if: "(1) during the course of the traffic stop the officer acquires an objectively reasonable and articulable suspicion that the driver is engaged in illegal activity or (2) the driver voluntarily consents to the officer's additional questioning." *United States v. Sandoval*, 29 F.3d 537, 540 (10th Cir. 1994) (internal citations omitted).

### 1.    Voluntary Consent

When a driver voluntarily consents to an officer's additional questioning, there has been no seizure, and therefore, the Fourth Amendment is not implicated. *Bradford*, 423 F.3d at 1158; *Sandoval*, 29 F.3d at 540. After returning Defendant's license and registration, Sgt. De La Garza said to Defendant, "If you don t mind, I have a couple questions I have to ask you." Sgt. De La Garza then articulated why he suspected Defendant may be involved in criminal activity and asked if he could search his vehicle. Defendant indicated that he did not have any contraband in the car and replied, "You can search it; you can bring the dog if you want to." At the suppression hearing, Sgt. De La Garza testified that he wished to move into a consensual encounter at this point and that he understood that Defendant had voluntarily consented to a search of his entire vehicle.[3]

Defendant argues, however, that De La Garza was acting in a very authoritative and overbearing manner, cutting him off, and not giving him an opportunity to respond. Defendant asserts that he tried to interject, but Sgt. De La Garza said, "Hold on!", and insisted on finishing

13

his declarations. *See United States v. Turner*, 928 F.2d 956, 959 (10th Cir. 1991) (finding that a "commanding tone of voice" is an objective indication to a reasonable person that he is not free to leave).  If Defendant did not feel free to terminate the encounter due to "an overbearing show of authority," then the continued questioning may have constituted an unlawful seizure. *Bradford*, 423 F.3d at 1158.  "[T]o determine whether a particular encounter constitute[d] a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 439 (1991).

The Tenth Circuit has identified a number of factors that courts may consider in determining whether an encounter was voluntary: (1) number of officers, (2) language and tone of voice, (3) whether the encounter occurred in a public place, (4) whether the suspect was advised that he was free to leave, and (5) whether the suspect's documents or other personal effects were returned. *See United States v. Ledesma*, 447 F.3d 1307, 1314 (10th Cir. 2006); *United States v. Broomfield*, 201 F.3d 1270, 1274 (10th Cir. 2000); *United States v. Hill*, 199 F.3d 1143, 1147–48 (10th Cir. 1999); *United States v. McSwain*, 29 F.3d 558, 563 (10th Cir. 1994); *United States v. Soto*, 988 F.2d 1548, 1558 (10th Cir. 1993); *United States v. Zapata*, 997 F.2d 751, 757 (1993); *Turner*, 928 F.2d at 959.  These factors are not exhaustive, nor is any one factor dispositive. *Sandoval*, 29 F.3d at 541 ("We did not intend . . . that the absence of those specific factors compels the conclusion that a driver consented voluntarily to a police-citizen encounter."); *Ledesma*, 447 F.3d at 1314.  Generally, "[t]he proponent of a motion to suppress

---

3. Sgt. De La Garza's version of the events at this juncture, rather than Defendant's, is clearly supported by the DVD.  Defendant initially consented to a search of the vehicle—and only later limited that consent to a search by a

bears the burden of proof," *United States v. Moore*, 22 F.3d 241, 243 (10th Cir. 1994); however, when the validity of a search or seizure is based on consent, the government bears the burden of showing that the consent "was freely and voluntarily given." *Florida v. Royer*, 460 U.S. 491, 497 (1983).

In the case at hand, when Sgt. De La Garza sought to continue the encounter, he had already returned Defendant's documentation, which generally signals to a driver that he is free to leave. *See United States v. McKneely*, 6 F.3d 1447, 1451 (10th Cir. 1993) (finding that a reasonable person would not feel free to terminate a police-citizen encounter without having his drivers license and registration returned). Of course, this is not conclusive, and there may be circumstances under which a reasonable person would not feel free to end a police-citizen encounter, even after the return of his documentation; for example, if there is an overbearing or coercive show of authority by the officer. *See Bradford*, 423 F.3d at 1158; *United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000) ("A consensual encounter is the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement officer."); *Turner*, 928 F.2d at 959. Therefore, the Court must look at the "objective impact of what [Sgt. De La Garza] said on a reasonable listener." *Sandoval*, 29 F.3d at 541.

Having reviewed the video of the encounter and listened to the witness's testimony, the Court finds that Sgt. De La Garza's conduct was not so overbearing and authoritative that a reasonable person would have believed he was not free to end the encounter. Sgt. De La Garza prefaced his statement with, "If you don t mind," and he had already returned Defendant's license and registration. Additionally, Defendant was standing in front of the patrol car, not seated inside of it, making it easier for him to terminate the encounter and walk back to his car.

ine.

*See id.* at 542; *but see Bradford*, 423 F.3d at 1158 (finding that the mere fact that suspect was detained in patrol car does not make detention involuntary).   Thus, the totality of the circumstances would have indicated to a reasonable person that he was free to proceed on his way, but Defendant chose to continue the encounter, giving rise to "a voluntary police-citizen encounter." *Sandoval*, 29 F.3d at 540; *see also United States v. Werking*, 915 F.2d 1404, 1408 (10th Cir. 1990).

### 2.   *Reasonable Suspicion*

Even if the Court were to find that Defendant did not voluntarily consent to continued questioning, if Sgt. De La Garza developed a reasonable suspicion of criminal activity during the traffic stop, then the investigative detention was still lawful. *United States v. Fernandez*, 18 F.3d 874, 878 (10th Cir. 1994); *Williams*, 403 F.3d at 1206 ("An officer may detain a motorist for questioning unrelated to the initial traffic stop if he has an objectively reasonable and articulable suspicion that illegal activity has occurred . . . ."); *Sandoval*, 29 F.3d at 540.   In making a determination of reasonable suspicion, the Court must again look at the totality of the circumstances to determine whether the officer had a "particularized and objective basis for suspecting legal wrongdoing." *Arvizu*, 534 U.S. at 273; *see also Williams*, 403 F.3d at 1207 (finding that a court "may not evaluate and reject each factor in isolation," as the "Supreme Court has expressly rejected this sort of 'divide-and-conquer' analysis").

At 3:21 a.m., Sgt. De La Garza had finished his investigation concerning the initial traffic stop, but he suspected that criminal activity was afoot and decided to detain Defendant for additional questioning.   The Government asserts that, at this moment, Sgt. De La Garza was aware of the following facts to support a finding of reasonable suspicion:

16

(a) Defendant was acting nervous, and his hands were visibly shaking when he handed his license and registration to Sgt. De La Garza;

(b) Defendant made a point of telling Sgt. De La Garza that he had been pulled over on four occasions in Lordsburg;

(c) Defendant's travel plans seemed suspicious, as did the time of day that Defendant was traveling;

(d) When Sgt. De La Garza asked Defendant the name of his friend that he was visiting in Tucson, Defendant hesitated in responding;

(e) Some of Defendant's answers seemed internally inconsistent or implausible;

(f) Defendant's passenger, Ms. Martinez, seemed lethargic, and her eyes were droopy, indicating she was under the influence of methamphetamine;

(g) Ms. Martinez avoided eye contact with Sgt. De La Garza, indicating that she was not telling the truth or had something to hide;

(h) Ms. Martinez was not sure exactly how long they had been in Tucson and gave inconsistent responses;

(i) There were inconsistencies between Ms. Martinez' responses and Defendant's responses; and

(j) This particular stretch of Interstate 10 between Lordsburg and Deming is a known drug corridor.

Although some of these facts if considered individually might seem innocuous, when considered in light of the totality of the circumstances and with "appropriate deference to a trained officer's ability to distinguish between innocent and suspicious circumstances," they lead to a finding of reasonable suspicion. *Williams*, 271 F.3d at 1269 (internal quotations omitted); *see also United States v. Wood*, 106 F.3d 942, 946 (10th Cir. 1997) ("reasonable suspicion may be founded upon factors consistent with innocent travel"); *Arvizu*, 534 U.S. at 273 (finding that officers are permitted "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them").

In the end, reasonable suspicion is a factual determination that must be made by the trial judge based upon "the credibility of the witnesses and the weight to be given the evidence together with the inferences, deductions and conclusions to be drawn from the evidence." *McSwain*, 29 F.3d at 561.  Based on the video and the witness's statements at the suppression

17

hearing, the Court finds that Sgt. De La Garza's continued questioning of Defendant was reasonable. This conclusion is bolstered by the fact the Tenth Circuit has recognized similar factual circumstances as supporting a finding of reasonable suspicion. *See, e.g.*, *United States v. White*, 584 F.3d 935, 950–51 (10th Cir. 2009) (nervousness and route of travel); *United States v. Clarkson*, 551 F.3d 1196, 1202 (10th Cir. 2009) (time of day and behavior of passenger); *United States v. Santos*, 403 F.3d 1120, 1127, 1129 (10th Cir. 2005) (implausible travel plans and vague, evasive or inconsistent answers) ("Confusion about details is often an indication that a story is being fabricated on the spot."); *Williams*, 271 F.3d 1262 (extreme and continued nervousness); *United States v. McRae*, 81 F.3d 1528, 1534–35 (10th Cir. 1996) (contradictions in alleged travel plans); *United States v. Kopp*, 45 F.3d 1450, 1453–54 (10th Cir. 1995) (suspicious travel plans).

### 3.    Probable Cause

The next question for the Court is whether Sgt. De La Garza had probable cause to seize Defendant's car until the Government could obtain a search warrant. "The predicate permitting seizures on suspicion short of probable cause is that law enforcement interests warrant a limited intrusion on the personal security of the suspect." *Royer*, 460 U.S. at 500. However, these brief investigative seizures of people and vehicles "must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id.* (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 881–82 (1975)). The prolonged seizure of Defendant's car in the case at hand was not justified by reasonable suspicion alone; therefore, at some point during the detention, probable cause must have arisen to justify the seizure. *West*, 219 F.3d at 1178 ("It is well established that although

18

probable cause to search a car may not exist when a car is first stopped for a traffic citation, it can arise during the course of the stop.").

"In enforcing the Fourth Amendment's prohibition against unreasonable searches and seizures, the Court has insisted upon probable cause as a minimum requirement for a reasonable search [or seizure] permitted by the Constitution." *Chambers v. Maroney*, 399 U.S. 42, 51 (1970).  Generally, this means that an officer must apply to a neutral magistrate for a search warrant.  "Only in exigent circumstances will the judgment of the police as to probable cause serve as a sufficient authorization for a search [or seizure]." *Id*.  A car suspected of carrying contraband, for instance, is exempted from the warrant requirement of the Fourth Amendment because "the car is movable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained." *Id*.; *see also Carroll v. United States*, 267 U.S. 132, 154 (1925) ("[T]hose lawfully within the country, entitled to use the public highways, have a right to free passage without interruption or search unless there is known to a competent official, authorized to search, probable cause for believing that their vehicles are carrying contraband or illegal merchandise.").

If the car is seized and impounded, rather than the officer performing a search on the spot, a warrant must be obtained before the car is searched. *Chambers*, 399 U.S. at 51 ("either the search must be made immediately without a warrant or the car itself must be seized and held without a warrant for whatever period is necessary to obtain a warrant for the search").  This is the situation the Court encounters in the case at hand.  Sgt. De La Garza seized the car, and his brother Agent De La Garza later obtained a warrant to search the car.  Provided Sgt. De La Garza had probable cause to seize Defendant's vehicle, this is arguably preferable to his performing a

19

search on the spot. *Id*. ("Arguably, because of the preference for a magistrate's judgment, only the immobilization of the car should be permitted until a search warrant is obtained; arguably, only the 'lesser' intrusion is permissible until the magistrate authorizes the 'greater.'").

"Articulating precisely what 'reasonable suspicion' and 'probable cause' mean is not possible" because "[t]hey are commonsense, non-technical conceptions that deal with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (internal quotations omitted). Generally, probable cause exists if "under the totality of the circumstances there is a fair probability that the car [to be searched] contains contraband or evidence." *United States v. Jurado-Vallejo*, 380 F.3d 1235, 1238 (10th Cir. 2004); *see also Ledesma*, 447 F.3d at 1316 ("Probable cause exists where the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed."). Additionally, "[i]n determining whether probable cause exists, an officer may draw inferences based on his own experience." *United States v. Mercado*, 307 F.3d 1226, 1230 (10th Cir. 2002).

The Court already determined that Sgt. De La Garza had reasonable suspicion to detain Defendant for additional questioning at 3:21 a.m.; however, Sgt. De La Garza did not seize Defendant's car until 3:42 a.m. During these intervening twenty-one minutes, Sgt. De La Garza further questioned Ms. Martinez and Defendant; dispatch informed Sgt. De La Garza that Ms. Martinez had a warrant out for her arrest in Grant County; and Sgt. De La Garza's brother informed him that Border Operations Task Force had information about Defendant moving methamphetamine in Deming. This additional information, combined with the facts already

discussed that led to a finding of reasonable suspicion, led Sgt. De La Garza to determine there was probable cause and seize the car.

In making a probable cause determination, the Court must look at the totality of the circumstances, keeping in mind that while a set of factors—each of which individually might be consistent with innocent travel—could, taken together, add up to a fair probability of criminal activity. *See United States v. Sokolow*, 490 U.S. 1, 9 (1989).  One of the primary factors that the Government cites in support of Sgt. De La Garza's finding of probable cause is Defendant's and Ms. Martinez's extreme nervousness throughout the stop.  While some level of nervousness is normal and to be expected in any police-citizen encounter, extreme or prolonged nervousness can weigh significantly in a court's assessment of probable cause.  *Ledesma*, 447 F.3d at 1318. Sgt. De La Garza asserts that Defendant's hands were noticeably shaking when Defendant handed him his documents.  Additionally, Ms. Martinez was nervous and avoiding eye contact throughout the stop, as if she had something to hide.

Another major factor that the Government emphasizes is Defendant's unusual travel plans.  Driving six hours round trip to visit a good friend for a couple hours is clearly suspicious, even in New Mexico.  And while this fact alone would not give rise to probable cause, when it is combined with other facts—Interstate 10 is a common drug route; the stop occurred at 3:08 a.m.; Defendant had trouble remembering the name of his friend; Ms. Martinez gave inconsistent answers in response to how long they had been in Tucson; Ms. Martinez had a warrant out for her arrest; and Defendant was allegedly involved in moving drugs in Deming—it is sufficient to support a finding of probable cause.  Indeed, the Supreme Court has clearly stated that "[c]ourts may not engage in a 'divide-and-conquer' analysis of facts to determine whether probable cause

21

existed."  *United States v. Valenzuela*, 365 F.3d 892, 897 (10th Cir. 2004).  Consequently, based on the totality of the circumstances and the logical inferences drawn by Sgt. De La Garza from his experience, the Court finds that there was probable cause to seize Defendant's car.

**B.**     **Second Motion to Suppress**

In his Second Motion to Suppress (Doc. 19), Defendant contests the validity of the search warrant under which the methamphetamine was seized.  Defendant contends that the allegations contained within the affidavit for the warrant were mostly "a recitation of stock language relating to generalized drug trafficking allegations" and that the warrant contained only minimal facts relevant to a determination of probable cause.  Additionally, Defendant claims that the warrant contained knowingly false and misleading statements and omissions by Sgt. De La Garza and Agt. De La Garza.  Finally, Defendant claims that the allegedly false and misleading statements in the affidavit and the unrecorded and unsworn conversation between Judge Robinson and Sgt. De La Garza present intentional police misconduct, precluding application of the good faith exception and rendering any evidence seized pursuant to the warrant inadmissible.  Therefore, Defendant requests that this Court suppress any evidence obtained through the search warrant or, in the alternative, grant a *Franks* hearing as to the allegedly false statements contained in the affidavit.

The Government argues that even if the warrant was defective, the officers carried out the search in good faith and reasonably believed there was probable cause to carry out the search; therefore, any evidence seized is admissible under the good-faith exception.  A court may "proceed directly to an analysis of the good-faith exception without first addressing the underlying Fourth Amendment question."  *United States v. Danhauer*, 229 F.3d 1002, 1005 (10th

22

Cir. 2000) (citing *United States v. Leon*, 468 U.S. 897, 924–25 (1984)).  Under the good-faith

exception, the Fourth Amendment should not bar the introduction of evidence that was obtained

by police officers who were acting in good faith and relying on a facially-valid search warrant.

*Leon*, 468 U.S. at 919–20.  There are, however, certain circumstances where an officer "would

not have reasonable grounds for believing a warrant was properly issued," and the good-faith

exception should not apply. *United States v. Tisdale*, 248 F.3d 964, 972 (10th Cir. 2001) (citing

*Leon*, 468 U.S. 897).  Defendant argues that all four of the situations recognized in *Tisdale* are

present in the case at hand:

> (1) the issuing judge was misled by false information and misleading omissions;
> (2) the issuing judge abandoned his role as a neutral and detached magistrate; (3)
> the affidavit was so lacking in indicia of probable cause that official belief in the
> existence of probable cause was unreasonable; and (4) the warrant was so facially
> deficient that the executing officer could not reasonable [sic] believe in its
> validity.

(Doc. 64, pp. 6–7.)

First, Defendant argues that the good-faith exception does not apply because the issuing

judge was misled by an affidavit containing false information and misleading omissions that Agt.

De La Garza knew to be false; and therefore, the Court must order a *Franks* hearing.

Nonetheless, these alleged misrepresentations or omissions by the affiant do not preclude

application of the good faith exception, unless there was intentional police misconduct

comprising a "reckless disregard of the truth." *Tisdale*, 248 F.3d at 972; *see also United States v.

Avery*, 295 F.3d 1158, 1166 (10th Cir. 2002).

Defendant asserts that the officers' off-the-record conversation with Judge Robinson

constitutes intentional police misconduct and precludes application of the good faith exception as

the officers' actions blocked any meaningful judicial review of whether the warrant was properly

23

supported by probable cause or whether the good faith exception applies.  Defendant argues that without the three missing pages from the initial "Body of the Affidavit" that was faxed to Judge Robinson at 7:30 a.m. to compare to the final version of the warrant which was approved by Judge Robinson at 8:11 a.m., the Court must discard these pages, making the warrant facially deficient and precluding application of the good faith exception.  Although the Government conducted a thorough search of its records, it appears that the initial draft of the "Body of the Affidavit" was discarded by Sgt. De La Garza after the officers made the changes.  The Court finds this consistent with the way word processing works—earlier iterations are generally overwritten so as not to confuse them with the originals—and does not find that the officers' actions constitute police misconduct.

In the Court's opinion, Defendant has not identified any intentionally false information or misleading omissions in the warrant, and the fact that the officers conversed with Judge Robinson and made some minor alterations to the initial draft of the affidavit, does not convince the Court that the officers were acting in bad faith.  The intimation by Defendant is that the officers acted inappropriately by making even minor changes to the "Body of the Affidavit"; however, this is distinct from the officers intentionally falsifying the affidavit.  Indeed, it was Judge Robinson who solicited the explanation of a pipeline and the change to the warrant; therefore, Defendant's assertion that the officers knowingly acted in bad faith is questionable. Additionally, the fact that Sgt. De La Garza explained the term pipeline to the judge does not evidence bad faith.  While a court cannot "rely on the [unrecorded] recollection of those concerned to support a probable cause finding long after the search warrant has been issued," the fact that Sgt. De La Garza provided an explanation of a common police term used within the

24

Body of the Affidavit of the warrant does not constitute police misconduct and does not compromise the integrity of an otherwise valid search warrant. *United States v. Hittle*, 575 F.2d 799, 802 (10th Cir. 1978).

A *Franks* "hearing on the veracity of the affidavit supporting a warrant is required if the defendant makes a substantial showing that the affidavit contains intentional or reckless false statements and if the affidavit, purged of its falsities, would not be sufficient to support a finding of probable cause." *Avery*, 295 F.3d at 1166.  Defendant argues that the officers' omission from the warrant that the stop occurred at 3:00 a.m., that the night was cold, and that Defendant's friend was a cowboy in Tucson for a rodeo, and the inclusion in the warrant that Ms. Martinez stated they had been in Tucson for the whole day rather than two or three hours as stated by Defendant, constitute intentional false statements or omissions by the officers and render the warrant invalid, or are at least warrant a *Franks* hearing.

As to the inclusion of Ms. Martinez' statement that they had been in Tucson the whole day, the Court does not find this fact to be false.  While Ms. Martinez' statements on the DVD were difficult to hear, having listened to the DVD and to Sgt. De La Garza's testimony at the motion hearing, the Court finds the Government's assertion that Ms. Martinez was being evasive and changing her story credible.  The inclusion of this fact in the affidavit served to show the inconsistencies between Defendant's story and that of his passenger, and this fact is consistent with the Court's findings.  With regard to the omission from the affidavit of the time of the day, the temperature, and the fact that Defendant had stated his friend was a cowboy, the Court does not believe these omissions were material to Judge Robinson's determination of probable cause; indeed, they appear to be nothing more than inadvertent omissions of immaterial facts. *See*

25

*Tisdale*, 248 F.3d at 974.  Since Defendant has failed to make a substantial showing that the alleged omissions or misrepresentations were intentional or reckless, and that if they were purged, the affidavit would not have supported a finding of probable cause, a *Frank's* hearing on the veracity of the affidavit is not required. *Avery*, 295 F.3d at 1166.

Next, Defendant argues that Judge Robinson abandoned his role as a neutral and detached judge, violating the second situation in *Tisdale*, 248 F.3d at 972.  The Supreme Court has consistently held that in order to be valid, a warrant must be issued by a neutral and detached magistrate. *See, e.g.*, *Johnson v. United States*, 333 U.S. 10 (1948).  The purpose of this requirement is that a dispassionate officer of the court not involved in the "competitive enterprise of ferreting out crime," make an independent determination of probable cause.  This Court finds that Judge Robinson's conduct in the case at hand does not rise to the level of what "the Supreme Court has held to compromise a magistrate's neutrality and detachment." *United States v. Ramirez*, 63 F.3d 937, 942 (10th Cir. 1995).

For example, where a magistrate participates in a search along with police, he is no longer acting in his or her required detached and neutral role. *See Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 327 (1979).  Instead, the magistrate has "become a member, if not the leader, of the search party." *Id*. at 327.  Or, where a magistrate is in some way involved in the investigation or prosecution of the case, then he can no longer be detached and neutral. *Coolidge v. New Hampshire*, 403 U.S. 443, 450 (1971) ("prosecutors and policemen simply cannot be asked to maintain the requisite neutrality with regard to their own investigations").  Additionally, where a magistrate has "a direct, personal, substantial, pecuniary interest in his conclusion to issue or to deny the warrant," this indicates that the magistrate's decision was not neutral and detached.

26

*Connally v. Georgia*, 429 U.S. 245, 250 (1977) (internal quotations omitted).  The conduct of Judge Robinson in the case at hand is a "far cry" from these examples. *Ramirez*, 63 F.3d at 942. The evidence adduced that Judge Robinson wanted a word in the affidavit—"pipeline"—defined for him and his request that the affidavits' language be changed to comport with the officers' belief that his request to search was "reasonable" is indicative of the judges diligence in reviewing and considering the warrant application.  In sum, he acted independently, impartially, and with the Defendant's constitutional protections in mind.

Finally, Defendant argues that the good faith exception should not apply in the case at hand because the warrant was so facially deficient that a reasonable officer would have recognized probable cause did not exist.  The Government, however, points to the following facts contained in the affidavit as supporting probable cause:

> (a) Defendant's hands were shaking profusely;
> (b) Defendant's story that he drove three hours to Tucson to visit a friend for just a couple hours and then drove three hours back to Deming in the middle of the night was highly suspicious;
> (c) Defendant hesitated when Sgt. De La Garza asked his friend's name;
> (d) Ms. Martinez appeared to be under the influence of methamphetamine; and
> (e) Defendant and Ms. Martinez gave inconsistent accounts of the length of their stay in Tucson.

(Doc. 19-2, pp. 9–10; Doc. 24, pp. 12–13.)  The Government asserts this provided sufficient support for the warrant such that a reasonable officer could have relied on the probable cause determination of the issuing judge.  The Court agrees.  Even if these facts were not sufficient to support a finding of probable cause, they are not so lacking in indicia of probable cause that the officers' belief in the existence of probable cause was unreasonable. *See Tisdale*, 248 F.3d at 972; *United States v. Tuter*, 240 F.3d 1292, 1300 (10th Cir. 2001) ("an officer cannot be expected to question the magistrate's probable-cause determination").

27

Defendant argues that the unrecorded explanation of a "pipeline" and the alteration of one sentence of the affidavit show that the officers were acting in bad faith.  Nonetheless, such minor additions to a warrant are acceptable as "[t]he Fourth Amendment does not require magistrates to maintain Sphinx-like inscrutability in passing on warrant applications." *Ramirez*, 63 F.3d at 941–42.  Indeed, Judge Robinson acted diligently in asking for explanation of terms he did not understand and ensuring that the warrant and the supporting affidavit were complete and supported a finding of probable cause.  If anything, Judge Robinson's inquiries and diligence bolstered the officers' belief in the warrant's validity.

"[T]he exclusionary rule is a judicially-fashioned, super-compensatory remedy whose focus is not on restoring the victim to [his] rightful position but rather on general deterrence." *United States v. Otero*, 563 F.3d 1127, 1133 (10th Cir. 2009).  Defendant has not made a substantial showing that the alleged omissions or misrepresentations were intentional or reckless, and that if they were purged, the affidavit would not have supported a finding of probable cause; therefore, a *Franks* hearing or a finding of bad faith is not warranted. *See United States v. Cantu*, 405 F.3d 1173, 1176–77 (10th Cir. 2005) (finding that a magistrate's initial "determination of probable cause is entitled to great deference"); *Avery*, 295 F.3d at 1166.  Without any showing of police misconduct, the Court will apply the good faith exception.

## IV.    CONCLUSION

In this case, the Court was asked to determine the constitutionality of the investigative detention of Defendant and the subsequent seizure and search of Defendant's vehicle.  There were potentially three distinct instances in which the Government could have violated Defendant's Fourth Amendment Constitutional rights: (1) the investigative detention after the

28

initial traffic stop, (2) the seizure of Defendant's vehicle, and (3) the search of the vehicle. Based on the parties' filings, the evidence presented at the suppression hearing, and the witness's statements, the Court finds that the Government did not violate Defendant's Constitutional rights.

**WHEREFORE**,

      **IT IS HEREBY ORDERED** that Defendant's First Motion to Suppress (Doc. 15) is **DENIED** and Defendant's Second Motion to Suppress and/or in the Alternative, Request for *Franks* Hearing (Doc. 19) is **DENIED**.


                                          _____/s/   Michael J. Reagan_____
                                          **HON. MICHAEL J. REAGAN**
                                          **UNITED STATES DISTRICT JUDGE**